# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. BOBBY CHARLES FARLEY, JR.

**Appeal from the Criminal Court for Madison County**
**No. 13-21    Donald H. Allen, Judge**

---

**No. W2013-02055-CCA-R3-CD  - Filed July 29, 2014**

---

A jury convicted the Defendant, Bobby Charles Farley, Jr., of driving under the influence ("DUI"); unlawful carrying of a weapon; violating the financial responsibility law; and violating the seatbelt law.  After a hearing, the trial court imposed an effective sentence of eleven months, twenty-nine days, to be served in the county jail.  In this direct appeal, the Defendant challenges the sufficiency of the evidence underlying his DUI offense and the trial court's instructions to the jury.  Upon our thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee, for the appellant, Bobby Charles Farley, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Jerry Woodall, District Attorney General; and Matthew Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with DUI with prior DUI convictions; two weapons offenses; violating the financial responsibility law; and violating the seatbelt law.  At the Defendant's jury trial, the following proof was adduced:

Tim Armstrong testified that, in September 2011, he was "a six-year trooper with the Tennessee Highway Patrol" ("THP"). On September 28, 2011, while off-duty, he left his house driving a pickup truck. As he pulled out of his driveway, he saw a red pickup being driven down the wrong side of the road. Armstrong began to follow the red pickup, and because the driver continued to drive down the wrong side of the road, Armstrong called THP dispatch. Armstrong continued to follow the red pickup until it was intercepted by Trooper Ganaway. The red pickup traveled in the wrong lane over the course of five miles, weaving across both lanes. Armstrong witnessed the red pickup avoid two near-collisions.

Trooper Ganaway pulled the red pickup over, and the driver stopped in the parking lot of a gas station. Armstrong followed and got out of his vehicle to observe the interaction between Trooper Ganaway and the driver of the red pickup, whom Armstrong identified as the Defendant. Armstrong testified about the Defendant's demeanor: "When [the Defendant] spoke, his speech was very slurred. [The Defendant's] eyes were droopy, they were watery, bloodshot. He somewhat stumbled, staggered as he walked. He was not very steady on his feet, leaning . . . against the back of the truck once he was gotten out." Armstrong stated that, in his professional opinion as a Trooper, the Defendant "was not safe to drive a motor vehicle." Armstrong also "form[ed] the opinion that the [Defendant] was under the influence of an intoxicant at that time."

On cross-examination, Armstrong stated that Trooper Kevin Brown arrived at the scene as back-up two to three minutes after the Defendant had been pulled over.

Trooper Kenny Ganaway of the THP testified that the red pickup pulled over "immediately" after he turned on his blue lights. He identified the Defendant as the driver. As Trooper Ganaway approached the red pickup, he noticed that the Defendant was not wearing his seatbelt. He asked the Defendant to step out of the pickup, and the Defendant complied. Trooper Ganaway then asked the Defendant for his driver's license and proof of insurance, and the Defendant told him that he did not have either item.

Trooper Ganaway noticed the Defendant stumble as he got out of his truck, and he stated that the Defendant "had to hold onto the side of the pickup truck" for balance. When Trooper Ganaway asked the Defendant if he had been drinking, the Defendant replied that he had not but that he had taken some Oxycontin. Trooper Ganaway then asked the Defendant to perform some field sobriety tests, specifically the "walk-and-turn" and the "one-leg stand." According to Trooper Ganaway, the Defendant was not able to complete the walk-and-turn test because he was stumbling "just all over the place," unable to keep his balance. The Defendant also was unable to perform the one-leg stand test. The Defendant's failure to complete either of these field sobriety tests indicated to Trooper Ganaway that the Defendant was under the influence of an intoxicant. Accordingly, Trooper Ganaway arrested

the Defendant. During the ensuing search of the Defendant's truck, a loaded .38 handgun was found.

The Defendant consented to a blood draw, during which Trooper Ganaway was present. The blood sample was sent to the Tennessee Bureau of Investigation ("TBI") for testing.

On cross-examination, Trooper Ganaway acknowledged that the Defendant's pickup was driving in the correct lane when he saw it. The Defendant pulled over and parked without hitting anything. He pulled the Defendant over at 1:48 p.m. The Defendant told him that he had taken the Oxycontin earlier that morning. The Defendant was cooperative during the stop.

Trooper Ganaway stated that his patrol car had a functional video camera at the time of the stop. However, he did not have a video of the stop because "they had installed a new satellite there at headquarters" and deleted the recording. Trooper Ganaway did not view the video recording before it was deleted. He acknowledged that other videotapes were also deleted by the new system.

Trooper Kevin Brown testified that he assisted Trooper Ganaway during the traffic stop of the Defendant. He described the Defendant's demeanor: "He was – really slurred speech, dry cotton mouth, thick tongue, would brace hisself [sic] as he'd lean up against the vehicle and talk with me, just more or less in a stupor-type – just – I could tell he was under the influence." Trooper Brown observed the Defendant as he tried to perform the field sobriety tests. He testified that, in his opinion, the Defendant "was definitely under the influence while he was operating this vehicle." He also opined that the Defendant had been unable to operate a motor vehicle safely.

Trooper Brown searched the Defendant's truck and found the loaded handgun under the driver's seat.

Dr. Tonya Horton testified that she was a forensic scientist with the TBI crime laboratory in Memphis, and she testified as an expert witness in the field of toxicology. She tested the Defendant's blood sample and determined that it contained a level of 0.08 micrograms per milliliter of the opiate hydrocodone. She explained that the therapeutic range for that drug was 0.03 to 0.25 micrograms per milliliter. She stated that the primary effect of hydrocodone was pain relief and that the possible side effects included sedation, lethargy, poor muscle coordination, and confused thoughts. She added that these possible side effects could result in erratic driving, slurred speech, and loss of balance.

Because her initial testing was inconclusive as to the presence of other drugs, Dr. Horton sent the Defendant's blood sample to another laboratory for further testing.

Special Agent John Harrison testified that he was a "special agent forensic scientist at the TBI Crime Laboratory" in Nashville. He testified as an expert in forensic toxicology. Special Agent Harrison tested the Defendant's blood sample after it was forwarded from the Memphis laboratory. His testing revealed the presence of three benzodiazepines: 7-amino clonazepam, clonazepam, and alprazolam. He explained that alprazolam was "prescribed as a drug called Zanax" and that clonazepam was "prescribed as a drug called Klonopin." The level of the alprazolam in the Defendant's blood was in the low end of the therapeutic range and the level of the clonazepam in the Defendant's blood was in the high end of the therapeutic range. Special Agent Harrison testified that he "didn't have a range for the 7-amino clomazepan" but asserted that that drug was "active also." He described all three of these substances as "central nervous system depressants."

Special Agent Harrison added, "because of the sedative effect of the drug, they are prescribed with the warning that they may affect your ability to operate the motor vehicle or safely handle any kind of heavy equipment." He stated that these drugs cause a loss of alertness and a reduction in focus, and he testified that, "in a driving situation, that would be an adverse effect because a person may not be as focused or attentive as they should be to operate the vehicle safely." He agreed that these drugs could cause a person to experience a loss of balance and slurred speech and could explain erratic driving. As to the combined effect of the four drugs found in the Defendant's blood sample, Special Agent Harrison testified that each of the drugs was a central nervous system depressant and, when combined, would have an additive effect.

On cross-examination, Special Agent Harrison acknowledged that the drugs affected individuals differently.

The State rested its case-in-chief after Special Agent Harrison's testimony and the defense presented no witnesses. The jury found the Defendant guilty of driving under the influence; unlawful carrying of a weapon; violating the financial responsibility law; and violating the seatbelt law. The State dismissed the other weapons charge, and the Defendant pleaded guilty to third offense DUI. After a sentencing hearing, the trial court sentenced the Defendant to an effective term of eleven months, twenty-nine days in the county jail. In this direct appeal, the Defendant challenges the sufficiency of the proof underlying his DUI conviction. He also alleges reversible error in light of the trial court's refusal to give a jury instruction about the State's loss of the video-recording of the Defendant's traffic stop.

**Analysis**

*Sufficiency of the Evidence*

The Defendant argues that the evidence was not sufficient to support his conviction of driving under the influence. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Our criminal code provides as follows:

It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of

any shopping center, trailer park or any apartment house complex, or any other premises that is generally frequented by the public at large, while . . . [u]nder the influence of any intoxicant, . . . drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess[.]

Tenn. Code Ann. § 55-10-401(a)(1) (Supp. 2011).

In this case, the State adduced proof that the Defendant drove erratically over the course of five miles; that, after being pulled over, he admitted to having taken Oxycontin earlier in the day; that he was unable to perform two field sobriety tests; that he was unsteady on his feet and slurred his speech; and that his blood sample revealed four drugs, all of which have a depressive effect on the central nervous system and could cause the Defendant's poor driving and other behavior. This proof was more than sufficient to support the Defendant's DUI conviction. Accordingly, the Defendant is entitled to no relief on this basis.

*Jury Instructions*

Prior to trial, the defense filed a motion to dismiss the indictment charging the Defendant with the instant offenses on the basis that the State had failed to preserve the videotape of the Defendant's traffic stop and that, as a result, the Defendant's trial would be fundamentally unfair. In the State's written response, it admitted that "it had a duty to preserve the videotape evidence." The trial court conducted an evidentiary hearing on the Defendant's motion to dismiss, and the following proof was adduced:

Trooper Kenny Ganaway testified that there was a videotape made with the equipment in his squad car of his stop of, and interactions with, the Defendant on September 28, 2011. The equipment in his squad car began taping the stop when Trooper Ganaway turned on his blue lights. The recording would have reflected the Defendant's performance of the field sobriety tests that he was asked to perform. However, before Trooper Ganaway had an opportunity to view the videotape, the videotape "was deleted by [their] new satellite system that was installed." The deletion occurred when Trooper Ganaway drove his patrol car within range of headquarters. Trooper Ganaway testified that the deletion was unintentional.

The trial court denied the motion to dismiss after finding that the State's failure to preserve the videotape "may have been simple negligence" but involved no "willful intent to destroy any evidence." The trial court also considered the other evidence the State asserted that it planned to offer at trial, including the testimony of the three THP Troopers who had been present at the traffic stop and the testimony of two experts about the

substances detected in the Defendant's blood sample.  The Defendant has not challenged the trial court's denial of his motion to dismiss.

The Defendant's trial ensued and, based on the State's loss of the video-recording of the Defendant's traffic stop, the defense requested, in writing, the following jury instruction:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value.  Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means.  The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.
>
> If, after considering all the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

Although the prosecutor stated that he was not opposed to this jury instruction, the trial court refused to administer this charge on the basis that the defense had failed to demonstrate that the video, had it been preserved, would have been exculpatory.[1]  By so ruling, the trial court determined that the Defendant's trial without the videotape and without the instruction was fundamentally fair.  See State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999) (setting forth the critical inquiry in cases involving lost or destroyed evidence as "[w]hether a trial, conducted without the destroyed evidence, would be fundamentally fair?") (footnote omitted).  We review the trial court's ruling de novo with no presumption of correctness.  State v. Merriman, 410 S.W.3d 779, 790, 797 (Tenn. 2013).

In Ferguson, our high court addressed the due process concerns inherent in the defendant's trial for DUI after the State lost its videotape of several of the defendant's sobriety tests.  2 S.W.3d at 914-15.  Adopting a balancing test for the determination of whether the defendant's ensuing jury trial was fundamentally fair under the Tennessee Constitution, the supreme court explained that the first step of the inquiry was "to determine whether the State had a duty to preserve the evidence."  Id. at 917.  Then,

---

[1] The trial court also stated that the videotape "never existed" and that "apparently they were trying to record it but it just simply didn't work."  However, the uncontroverted testimony established that the video-recording was made automatically and then unintentionally deleted from the system by the new computer program before it could be viewed.

If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach. Those factors include:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). Our high court continued:

Of course, as previously stated, the central objective is to protect the defendant's right to a fundamentally fair trial. If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges. Dismissal is, however, but one of the trial judge's options. The trial judge may craft such orders as may be appropriate to protect the defendant's fair trial rights. As an example, the trial judge may determine, under the facts and circumstances of the case, that the defendant's rights would best be protected by a jury instruction.

Id. The supreme court provided an example of such a jury instruction that is virtually identical to the instruction requested in the instant case ("the Ferguson instruction"). Id. at 917 n.11.

Applying this calculus to the facts before it, the supreme court in Ferguson first concluded that, because the videotape of the defendant's performance of sobriety tests "may have shed light" on the defendant's appearance and condition at the time, "the State had a duty to preserve the videotape as potentially exculpatory evidence." Id. at 918. We agree with the prosecutor in this case that the same conclusion is called for here. We also conclude, as did the supreme court in Ferguson, that, "[i]n erasing the tape before the defendant had an opportunity to view it, the State breached this duty." Id.; see also Merriman, 410 S.W.3d at 793 (recognizing that, "when potentially exculpatory evidence is lost or destroyed, negligence by the State is presumed").

-8-

Accordingly, we must consider the degree of negligence involved. The trial court determined that the State's failure to preserve the videotape of the Defendant's traffic stop was simple negligence, at most. The record supports this conclusion. Apparently, new technology caused an inadvertent erasure of the video-recording, and this "glitch" was not discovered until after other video-recordings also were inadvertently deleted. Therefore, we conclude that the destruction of the evidence was the result of simple negligence. See State v. Thomas Lee Hutchison, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *24 (Tenn. Crim. App. Apr. 11, 2014) (opining, "because the evidence was destroyed accidentally, we agree with the trial court that the destruction was due to simple negligence"); cf. State v. Dustin Wayne Capps, No. E2007-02734-CCA-R3-CD, 2009 WL 690685, at *5 (Tenn. Crim. App. Mar. 13, 2009) (State's loss of evidence was gross negligence when officer took videotape out of the confiscation holds department of the police department and then returned the videotape to the originating store; return of videotape was not in keeping with police department procedure and originating store taped over the recorded evidence), abrogated on other grounds by Merriman, 410 S.W.3d at 791.

Next, we consider the significance of the lost tape. As it was in Merriman, "[t]he lost evidence was significant because it recorded [the defendant's] conduct, which provided the factual basis for [the] charges." 410 S.W.3d at 795. The recording would have permitted the jury to see for itself the Defendant's posture after he got out of his truck and his attempts to perform the field sobriety tests. It also may have recorded his voice, allowing the jury to determine for itself whether the Defendant was slurring his words.[2] Therefore, the videotape may have had a negative impact on the credibility of Trooper Ganaway's, Trooper Brown's, and ex-Trooper Armstrong's testimony. We also recognize that the videotape was unique evidence with no equivalent proof available. See Merriman, 410 S.W.3d at 792-93 ("A video recording from a patrol vehicle is unique by its very nature. No evidence comparable to this video recording could have been obtained through other means."). Finally, we consider the sufficiency of the evidence used to convict the Defendant, which we have set forth above.

Based on this analysis, we hold that the trial court erred when it refused to give the Ferguson instruction because the loss of the videotape implicated the Defendant's due process right to a fundamentally fair trial. The trial court relied on the Defendant's failure to establish that the lost videotape was exculpatory as the basis for denying the requested jury instruction. This reliance was misplaced. As our supreme court explained in Merriman, it is sufficient if the lost evidence *potentially* possess[ed] exculpatory value and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 410 S.W.3d at 785 (citing Ferguson, 2 S.W.3d at 915, 918) (emphasis added). Clearly, a videotape of the Defendant's traffic stop may have revealed

---

[2] Trooper Ganaway testified at trial that the video equipment also recorded audio.

details that, at least arguably, conflicted with the arresting troopers' and Armstrong's recollection of the Defendant's behavior. Thus, the trial court erred in its ruling.

We turn then to the effect of the trial court's error. Because the Ferguson instruction is intended to protect a defendant's due process right to a fundamentally fair trial, see Ferguson, 2. S.W.3d at 917, a trial court's erroneous failure to provide a Ferguson instruction is subject to constitutional harmless error analysis. See, e.g., State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2013) (recognizing that a trial court's failure to instruct the jury on a material element of a charged offense is a constitutional error subject to constitutional harmless error analysis) (citations omitted); Manning v. State, 500 S.W.2d 913, 916 (Tenn. 1973) (trial court's erroneous failure to give alibi instruction was harmless where it was "clear beyond a reasonable doubt that had the instruction been given the outcome of the case would have been the same"). That is, the Defendant is entitled to relief unless the record demonstrates, beyond a reasonable doubt, that the trial court's error was harmless. See State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002) (in reviewing whether instructional error is harmless, appellate court must ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained") (citation and internal quotation marks omitted); see also State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) ("The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless.").

We hold that the trial court's erroneous refusal to give the Ferguson instruction in this case was harmless beyond a reasonable doubt in light of the strength of the State's proof. At most, the missing videotape would have impeached the testimony of Troopers Ganaway and Brown and ex-Trooper Armstrong. However, the Defendant himself admitted to having taken Oxycontin on the morning he was pulled over. His blood sample revealed the presence of not only Oxycontin but also three other sedative drugs. Expert testimony established that these drugs acting in concert would have an adverse impact on a person's ability to drive and could cause the Defendant's reported behavior. Finally, ex-Trooper Armstrong testified that he witnessed the Defendant driving erratically for five miles before being pulled over. In light of this extensive proof of the Defendant's driving while under the influence of an intoxicant, we are convinced beyond a reasonable doubt that the jury would have convicted the Defendant even if the videotape had depicted him performing better on the field sobriety tests than described by Troopers Ganaway and Brown. Accordingly, we hold that the Defendant is not entitled to relief on the basis that the trial court erroneously refused to give the requested instruction about the missing videotape. See State v. Terrell B. Johnson, No. E2012-01946-CCA-R3-CD, 2013 WL 6237090, at *14 (Tenn. Crim. App. Dec. 3, 2013) (holding that trial court should have provided the Ferguson instruction but that the lack of the instruction "was harmless in view of the strength of the State's case").

## **Conclusion**

For the reasons set forth above, we affirm the Defendant's convictions.

_____
JEFFREY S. BIVINS, SPECIAL JUDGE